Good morning, Your Honors. May it please the Court, my name is Mary Ann Dugan, and I represent the appellants in this case. I've got a question that's been troubling me in this case. My question is, I don't understand why Oregon is paying the feds through their cougar hunting form. Ordinarily, in any state, there are a lot more state fish and wildlife officers than federal ones. And I can't see why somebody, if the feds fly in anyone from outside Oregon, he won't be as good at managing the Oregon woods. I don't understand. Why are they paying the feds? Well, a couple of issues, Your Honor. First of all, there is a wildlife services office in Oregon, in Portland. And as explained in the record at ER 90, that doesn't have a federal fish and wildlife services office in it? If not, I don't see why that matters. I don't believe so. But to go on, Your Honor, I just wanted to point out, they're not flying them in. But ER 94 and 96 talk about, this is the environmental assessment by wildlife services,      So I don't see why they're paying the feds and stringent reporting requirements. Do you have any Oregon hunters with dogs? I mean, that doesn't answer my question as to why they hire the feds. ODFW does not have trained hunters with dogs, correct, Your Honor? Isn't it a fact that per cougar, it costs less to have wildlife services kill the cougar than have the Oregon functionaries do it? That may well be, Your Honor, especially if you look at ER 246. The funding issues appear that they're getting a pretty good deal there. They get more cougars for the bang. I think that may be true, Your Honor. I don't know if I fully answered your questions, but I think this ties into where I was going. I think that answers it. If the feds, I don't understand why it would be cheaper, but it's cheaper. Well, I mean, this isn't strictly in the record, though it may be buried in the EA, but it is true that wildlife services has a long history, despite their name, of killing animals. I mean, that's a large part of what they do. That is a large part of their mission. ODFW, on the other hand, frankly, has a mission of biological assessments and looking at impacts to species rather than killing species. And a lot of times, wildlife services has been contracting with the counties in Oregon, and the record points out that cougar complaints are generally addressed by wildlife services in the counties where there have been wildlife services programs. That's at page 232. In other counties where there's no wildlife services, it's the landowners themselves who kill the cougars, and under the law, the landowners are only allowed to kill problem cougars. Now, this discussion was leading up to my next question, was I don't see why this NEPA process would matter at all if the State would kill the cougars anyway if the feds didn't. It looks like the most you could accomplish here is to tie up the feds in a NEPA process, and then the State would just kill cougars without them. And if that's so, then that would justify the district court's determination that there's no standing because there's no remediability. Well, a couple things on that, Your Honor. The wildlife services pointed out in its environmental assessment that it has its own, quote, formalized decision model for handling cougar management, and that's at ER 94, and it involves both lethal and nonlethal management. And the other thing is that as a Federal agency, unlike Oregon, which has no State NEPA, the Federal Government is required to look at alternatives. And, of course, we listed several alternatives that were suggested in our brief at page 7. Let's suppose, best case for you, the feds, we were to determine their standing, and the district court was to determine that the environmental assessment was inadequate because they didn't look at all the alternatives for what to do about the cougars, and that there needs to be a full NEPA statement. And after doing the full NEPA statement and giving it the hard look they're supposed to, the feds say, we've decided we're not going to kill cougars. We think there ought to be lots and lots of cougars, more, not less. And couldn't Oregon just go ahead with this program while this process was going on and after it was done and even after the feds had decided killing cougars is bad, and just through the State agency or through letting hunters do it, they can do whatever they want. They can number down from 5,000 to 2,000 as they want. Well, a couple of things, Your Honor. First of all, the record shows that before Wildlife Services assisted ODFW, the number of cougars killed was much lower. It went up by 50 percent after Wildlife Services. Let me ask you about that question. I saw that there were historically that you had evidence in the record that the Fish and Wildlife, ODFW, I guess, hired essentially Wildlife Service to kill cougars. And so after they hire them, the killings go up. I mean, that's just sort of when you hire someone to do the work, the work gets done. But that didn't seem to me to address Judge Kleinfeld's question, and I was looking for any evidence in the record that absent Wildlife Service, not just the historical record, absent Wildlife Service, ODFW would not be able to kill the number of cougars that are in their cougar management plan. So is there any evidence in the record that ODFW would be precluded from killing the number of cougars they had in their plan? They're not precluded at all. But what has happened is that, and this is a quote from ER 248. Doesn't that just kill redressability then? If there's no evidence that ODFW can't just do what's in its plan, then there's the issue, it's not redressable, the claim is not redressable under Lujan, and then there's no standing. Well, it's not that they're precluded. I'll give you an example, and this is distinct from the 28J letter case that was presented. If there's a State that wants to build a highway, and there's a great amount of Federal funding available to build a highway, and they get funding from the Federal Highway Administration, that has always been deemed to be Federalization of that project. Now, the fact that the State is not precluded from building the highway without those funds does not mean that this Federal action is not making it more likely. My first question, yeah, if the Feds were providing 95 percent of the money, as they usually do with highways, and they quit providing the money, good chance the roads wouldn't get built. But here the State's providing the money. Instead of the Feds giving the money to the 95 percent to the State, the State's giving 100 percent to the Feds. So I don't see the analogy. The analogy is... It seems like there's no reason to think that the State couldn't kill cougars, because they think they're killing 70 percent of the kills now. If you're citing the new evidence that's in the record, Your Honor, I don't believe that reflects the record that was before the lower court. The ODFW has, quote, increased its reliance on wildlife services to resolve cougar conflicts, and in most cases needs wildlife services help. That's in the record at page 248. The record shows that they use wildlife services because they are professionals, they have professionally trained, they have specially trained dogs for these cougar kills. And the other issue that is important is that, as wildlife services pointed out in its own EA at ER 94 and 96, wildlife services has stringent, and that's their word, monitoring and record keeping and reporting. They report back to ODFW so that ODFW can use that information for adaptive management. And that was part of the goal of the Oregon Cougar Management Plan, that's at ER 83, is to get information back from professionals, from an agency that knows how to do this. The evidence of how ODFW is going about killing cougars when they're not using wildlife services is unclear, but it is clear that in the past, ODFW said that in the counties without wildlife services, it is the landowners who are killing the cougars, and that can only happen in reaction to a problem cougar, a cougar that actually kills livestock. And so this also happens. It would be illegal. Yes. And I would guess that landowners' definition of what is a problem cougar is probably broader than that. Yes. I think that the law allows a landowner to kill the record shows that the law allows a landowner to kill an animal, a cougar that has actually killed livestock, whereas The amendment in the statute didn't affect that. There was an amendment to the statute allowing, it says, State Department of Fish and Wildlife is authorized to appoint persons to act as agents for the department for the purpose of using one or more dogs to hunt or pursue black bears or cougars. So did that, how did that change the scenario, or doesn't it change it? We have not briefed the new, that new law, because it is new, and there are still, as I understand it, there aren't even the regulations yet to implement that. But they would still, those volunteers would still have to become agents. They would have to fall under certain protections, I'm sorry, provisions that guarantee that they're doing this in a manner that is as professional as wildlife services. There's no evidence in the record. Do they kill them with bullets or traps or poison or what? I am not sure. In general terms, without the provisions and the methods and all that, I was just wondering what we're talking about. Well, I believe the record at page 246 breaks it down between dogs and traps. How the cougars are killed is not in the record. I'm sorry. The Wildlife Services itself talked about the potential for change in legislation, Judge Ikuda, and that's on page ER 96. And they stated that, in their opinion, as a professional agency who knows how to kill cougars, that using volunteers would be insufficient to accomplish the secondary goal of having professionals do this and have the stringent monitoring and reporting that is a key requirement or goal of the Cougar Management Plan. The Cougar Management Plan is not just designed to kill cougars. It's designed to give information back to the agency. And I will reserve my time for rebuttal if you'll allow me. Thank you. Thank you, Counsel. May it please the Court, my name is Ellen Durkee from the Department of Justice, and I represent Wildlife Services. This Court should affirm the District Court's judgment on summary judgment that these plaintiffs lack standards. I was going to say about why the State hires the feds. I was thinking the way they deal with problem animals in Alaska anyway is they just let the hunters kill them, grant some permits for animals. Oh, if there are too many moose in a range, allow the killing of female moose. Pretty easy. How come the State is hiring the feds? Well, I think that the background in the State of Oregon is this. In 1994, the State, through a referendum, prohibited private hunters from using hounds to hunt cougars. And the most effective way to hunt cougars has historically been using hounds. And so prior to 1994, there was no need for proactive killing. If you're going to chase a cat, you use a dog. Right. And this is a cat. So the hunting has been, since the hunting, the hunting went from being sort of 40 percent. So why hire the feds? I can see why the background in Oregon makes the whole thing a little complicated politically, which is what that speaks to. But once it's not complicated politically, then the State of Oregon now has legal authority to take care of the ranchers' concerns that the cougars are eating their stock. And I still don't understand why they have to hire the feds instead of doing it themselves. Well, I don't know that they have to hire the feds. They chose to. Why do they hire the feds? Why do they hire the feds? Well, first of all, Wildlife Services is a service agency, and so they're not going to do it unless the State pays them. But the reason I think they went ahead and paid them is because they do have people who are trained and experienced. But that is not to say that there are not people capable, non-federal people capable of doing this. But they're much more efficient. Wildlife, the record shows that the kill rate on cougars went up 50 percent when they hired Wildlife Services. Actually, Your Honor, I think that the way the numbers are being used is somewhat skewing this. If you want to talk about the cost per cougar, I'd point out that in the Heppner target area, which was done only by State employees, they removed 53 cougars. So if you did it per cougar cost, that was more efficient. I'd also point out that in the recent evaluation by the State, they pointed out that their own employees, as they had more experience, got much more efficient, that the salaries went down from $75,000 per year being paid to State employees to do this, went down to $29,000 per year because they got much more proficient at it. So I think that you can't simply just assume that if Wildlife Services is doing it, it's going to be cheaper. The other thing is that they are using volunteers now. They are using volunteers. And I think that it's fair to say that they are using volunteers to try to protect the cougars during this – after they adopted the plan. Isn't it as simple as this? The protected interest, which the plaintiff claims, is the ability to see cougars on hikes, right? If Wildlife Services kills cougars more efficiently, cheaply, and in greater volume than do the state employees, then the plaintiff's interest is injured. And by stopping wildlife from doing it, the state – the injury is regressed. So why isn't that clearly a claim? If we allow that it is a statutory right to see a cougar. I think this is why that scenario breaks down, and what the flaw in it is this. Under the case law, if redressability is dependent on the actions of a third party, the burden of proof, this is Lujan v. Defenders of Wildlife, says that the burden of proof is on plaintiffs to show through evidence that there would be redressability. No. I think you're wrong. On the summary judgment motion, it's not a burden to show. It's a burden to create a material issue of fact. Your Honor, if you go that direction and say they've shown a material question of fact, then the only relief they can get from this court is a remand to look into a factual dispute about standing. About standing. That's right. However, I don't think that they have shown even that there's a material dispute of fact. Once you grant that there is some evidence in the file that the Wildlife Service is more efficiently and quickly kills cougars than do the worthies from the Oregon Department of Fish and Wildlife, once the feds are more efficient and quicker, then the plaintiffs see fewer cougars. Their injury is patent. Well, Your Honor, I... I mean, there's an issue of fact as to standing. Well, I think that the claim that the feds are more efficient is where, you know, is another falsehood, which I wanted to address next, as to why this hypothetical doesn't work. Well, now, wait a minute. Are you disputing that there's sufficient evidence in the record to allow a reasonable trier of fact to determine the feds kill cougars quicker? No. I'm saying that the money that the state gives to the federal government for services in two of target areas, not in all of them, could be used to hire different people. But if they hire different people, they can't... if they hire Oregon bureaucrats, they don't kill as fast as Wildlife Services. Cougar for cougar. Well, I think that's not been shown to be even a reasonable inference to take from the information here. Well, but I thought we all agreed that the Wildlife Services are more efficient and quicker at killing cougars. No, I don't agree with that, Your Honor. You don't? You don't think there's enough evidence from which a reasonable trier of fact could so find? No. As I pointed out, the Heppner area, which has had the most takes, are state employees. They have been most efficient there. So to draw the conclusion by... what they're doing is they're saying in East Beulah, once Wildlife Services was hired, they took more cougars than the previous year when they weren't hired. But I think all that proves is they did the job they were hired for. That previous year, again, going through the recent evaluation, it was pointed out that weather conditions did not permit. No, Your Honor. So you can't... I don't think you can make the conclusion. It is the personnel when there are other factors. You don't have to. You may not agree with that conclusion. The question is, do you suggest that no reasonable person could make that conclusion? That's the burden you have. Well, I think that no reasonable person could make it simply by looking at the numbers that were taken in a two- or three-year period without looking behind what contributed to those numbers. And, you know, with all due respect, Your Honor, I think you have to, you know, if you look at Lujan v. Defenders of Wildlife and how it has been interpreted in subsequent decisions by courts, an example is the D.C. Circuit in the O'Hare cases.  Give me the facts. Where is the evidence that says, cite it whichever way you want, that no reasonable person could find that the feds are quicker and cheaper at killing cougars than are the state people? I don't think it is a question of quicker and cheaper. The question is whether could the state accomplish this without the federal party. And they could. Now, maybe they... It may take longer, right? Excuse me. It may take more personnel, but they have that person. Right. But that's speculative. The question is, can a person conclude that based on the evidence that's in the record, the feds kill cougars faster and cheaper? If so, the injury to the plaintiff of seeing cougars, because the plaintiff has a right to see cougars, is decreased when feds are involved. Your Honor, I'd like to talk about this injury in fact, about seeing cougars. The district court found that only one of the affidavits provided standing, and that particular person was Stephanie Tidwell, who lives in the Jackson Target area. Now, her claimed injury was she had property. She was concerned that they would be coming on her property. She had concerns about using traps in the neighborhood of where she lived. And so the injury wasn't really based on simply seeing cougars in the abstract. Now, the reality is that the Jackson Target area has been terminated. They are not, the state is not conducting this program in Jackson anymore. You say that no plaintiff has alleged or has proven by affidavit that plaintiff's interest in seeing cougars exists. In the areas, you know, I mean, one of the things we've learned from Summers, the Summers Supreme Court decision, is that you have to show some kind of nexus to where it's happening. The only affidavit here that shows a nexus to where administrative removals were planned to take place was in the Jackson area. They are not taking them in the Jackson area. There is no affidavit that ties us to East Beulah. There is no affidavit that ties it to Heppner. Now there are four new target areas, and there's no affidavits that show any use of those areas as well. Counsel, you have read these books more carefully than I have, and I want you to educate me. First of all, how do they kill the cougars? Trapping or shooting or poison or all three or what? They do not use poison. They use hounds to track and then usually shoot them once they find them, or they use traps, either snares or live cages. Excuse me? Bullets and traps. Yes. Okay. And the idea of the dogs is to scare up the cougars so you can see them in order to shoot them. Right. I mean, these are very elusive animals. Very few people ever see them. The affidavits that were used by the plaintiffs to establish standing, were there some that said, I like to go hiking around in the woods and I hope to see a cougar, or were they all, I have dogs and I'm afraid they'll be caught in the traps or what? I can't remember. Well, the 10-1-1 aside who talked about she lived in the area, she had concerns about, you know, her own animals, her pets going into traps and so on. The other four were very general. I like cougars. I live, you know, some of them don't live in Oregon or whatever. I like cougars. I, you know, I have an aesthetic interest in having more cougars on this earth. Yes. Did they say, I go in the area where they're planning to kill cougars? No, they did not. In fact, one of them I think says, I use the western United States. The ones who are concerned about traps, people that have pets are always concerned about other people who do trapping or just the traps to get their pets. Were any of them in the cougar killing area? The one with Stephanie Tidwell, and she was in the Jackson target area, and she's the only one that expressed concern about her pets and traps. And what you said about her was there are no more takings there. That's correct. There had been takings? The state plan is set up for three-year reevaluations. From 2006 to 2009, there were attempts by both the Federal employees and State employees to administratively remove cougars in that area. Starting in 2009, it was eliminated as a target area. Give me a long answer. I can't remember the question by the time you get to the answer. There were. There are not now. What I want to know is, are they going to do any more trapping in Stephanie Tidwell's area? No. Okay. Now, on the sighting people, the people that say, I like to see cougars, did any of them say, I go to or have concrete plans to go to any of the areas where the cougar killing is going on? I do not believe so. In the areas that were targeted, that were identified as this is where this is going to occur. So your position is that the record is bereft of any personalized, particularized injury under Lou John? Yes. And that's what the district court said. The district court itself said, you know, four out of the five of these affidavits don't do it. The only one that does is Stephanie Tidwell. And what I'm suggesting today is that given the termination of the program in Jackson, that there, you know, at this point, there's no affidavit that shows a particularized injury. And I have many more things I wanted to talk about, but my time is up. And so unless the Court has other questions, I'll stop there. Thank you, counsel. Counsel for appellant, would you please deal with that last point? Are there any affidavits of hikers or visitors to Oregon who claim to have an interest in sighting cougars who will be affected by an increased rate of cougars being,  Your Honor, frankly, because the defendants did not cross-appeal the finding of an injury in fact, I would have to do a supplemental memo on what the other affidavits say. But I will point out that laid law, the Supreme Court said that standing is determined at the time the complaint is filed. And so we do not then go outside the record and start adding new information about where cougars are or are not being killed at this moment. At the time the complaint was filed, Stephanie Tidwell had an injury in fact. And the district court determined that. And that finding was not cross-appealed, nor was it briefed. How about the other affidavits or any of the other affidavits, plaintiffs who claim injury in fact by the probability of decreased sightings of cougars? Your Honor, yes. I believe all of them expressed concerns generally. Each of them is a member of one of the plaintiff organizations who expressed not only a personal localized interest in their own hometown area, but also an interest in seeing cougars in general in Oregon and in the wild in general. Again, because this was not made an issue on appeal. I'm not interested in seeing cougars. I think it would really be neat to see a cougar in the Oregon area where they are. But I have no plans to go there. So I don't think I would have standings to challenge something that was being done there. Isn't that the correct law on standings, that you need a plan to go there? When it becomes a geographically localized issue, yes, Your Honor. Not the Defenders of Wildlife, but the Wilderness Society. I think it was a Sierra Club case that the affidavits that will do the job are the ones that say I regularly hike there or I'm planning a hiking trip there. Yes, Your Honor. And it's my memory that the standing declarations do say that. It's just that the one that the Court focused on and said that's sufficient, we'll stop there, because you only need one plaintiff with an injury in fact. And you look at it at the time of the complaint. And so this was never made an issue on appeal. If it is of concern to Your Honors, I would be glad to do a very short supplemental memo summarizing. Your case should stand on Stephanie Kidwell having a concern about her animals getting caught in traps, which still existed at the time she filed, even though it would not be regressible at this time. Yes, Your Honor. Though I would say, again, if Your Honors are concerned as to how that relates to the regressibility issue, I'd be glad to brief that. And I believe that. Okay. Thank you very much, Your Honors. I see my time is up. Goat Ranchers v. Williams is submitted.
judges: Kleinfeld, Bea, Ikuta